Eric **BENEDICT**, Plaintiff,

v.

**HEWLETT–PACKARD COMPANY,** Defendant.

**Case No. 13–cv–00119–BLF**

United States District Court, N.D. California, San Jose Division.

Signed March 28, 2016

Filed April 8, 2016

458

Kelly M. Dermody, Anne Brackett Shaver, Daniel M. Hutchinson, Martin Daniel Quinones, Lieff, Cabraser, Heimann and Bernstein, LLP, Jahan C. Sagafi, Outten & Golden LLP, Marc Anthony Pilotin, U.S. Department of Labor, San Francisco, CA, Adam T. Klein, Jennifer Lin Liu, Juno E. Turner, Outten & Golden LLP, New York, NY, Nantiya Ruan, University of Denver College of Law, Denver, CO, Olivia J. Quinto, Outten and Golden LLP, Manhattan, NY, Paul William Mollica, Outten and Golden LLP, Chicago, IL, for Plaintiff.

Wendy M. Lazerson, Caryn F. Horner, Sidley Austin LLP, Palo Alto, CA, David Ryan Carpenter, Max Fischer, Sidley Austin LLP, Mark E. Haddad, Sidley Austin Brown & Wood, Los Angeles, CA, for Defendant.

## ORDER DENYING PLAINTIFFS' MOTION TO CERTIFY CLASS

### [Re: ECF 306]

BETH LABSON FREEMAN, United States District Judge

Plaintiffs, former Hewlett–Packard ("HP") employees, seek certification of three classes pursuant to Rule 23: Technical Solutions Consultants ("TSCs") I–III at HP who provided technical support for various arms of HP's Enterprise and Software Groups in California, Colorado, and Massachusetts. Plaintiffs contend that all of the purported class members perform the same "limited troubleshooting role" pursuant to "regimented procedural guidelines" and that HP misclassified them as exempt, resulting in unpaid overtime wages and other violations of federal and state labor laws. Defendant opposes the motion, arguing that the actual work performed by the purported class members differs significantly and that Plaintiffs have therefore failed to meet their burden to show that the Court could adjudicate their theory without the need for individual inquiries. For the reasons below, the Court DENIES Plaintiffs' motion.

## I. BACKGROUND

### A. The Parties

Eric Benedict worked for HP as a TSC III in California from April 2011 to February 2012, Benedict ¶¶ 2–3, ECF 310; Kilricanos Vieira worked as a TSC III in Massachusetts from April 2010 to July 2012, Vieira ¶¶ 2–3, ECF 312; and David Mustain worked as a TSC II in Colorado from December 2008 to September 2013, Mustain ¶¶ 2–3, ECF 311. Plaintiffs allege that HP misclassified them as exempt from overtime pay, and that they and their similarly-situated colleagues routinely worked more than 40 hours per week without overtime pay.

The Court[1] previously conditionally certified this case as a Fair Labor Standards Act ("FLSA") collective action, see ECF 175.

Plaintiffs now seek certification of three state classes—TSCs I–III in California, Colorado, and Massachusetts working in three HP organizations providing technical support for HP products: (1) HP Enterprise Group, Customer Solutions Center ("Enterprise Group"); (2) HP Software: Support Delivery / IMBU Support ("HPSW Support"); and (3) HP Software: Enterprise Security Products ("ESP"). Mot. at 1.

Defendant Hewlett–Packard Company ("HP") is a global corporation that provides information technology products and services throughout the world. HP offers a variety of products to a variety of customers: the Software Group ("HPSW") alone markets 141 different product suites, see Exh. F to Def.'s Mot. to Seal ("Davis") ¶¶ 5, 12, ECF 330–15, while the Enterprise Group ("EG") sells hardware, along with associated operating systems and software, see Exh. Q to Def.'s Mot to Seal ("Kumar") ¶ 4, ECF 330–37. HP's customers range from small businesses to financial institutions, telecommunications providers, hospitals, airlines, manufacturers, government agencies, and other technology companies. See Kumar ¶ 5; Davis ¶ 6; Exh. E to Def.'s Mot. to Seal ("Clemons") ¶ 3, ECF 330–13.

Generally, HP's customer have their own IT departments, which are responsible for the routine maintenance, operation, and troubleshooting of HP products within their environments. See, e.g., Davis ¶ 6; Clemons ¶ 4; Kumar ¶ 6. But when the internal IT department cannot resolve an issue, customers can turn to HP's support engineers. See id. Plaintiffs contend that all purported class members are or were such support engineers.

### B. Job Architecture Policy

HP uses a Job Architecture ("JA") Policy "to organize work and classify employees using a global hierarchy of jobs." Exh. 1 to Pilotin Decl. at 1, ECF 309–1; see also Exh. 2 to Pilotin Decl. at HP0002337, ECF 309–2 ("JA provides key inputs for managing the global workforce by classifying work into

---

1. References to "the Court" encompass actions taken by Judge Koh, to whom this case was previously assigned.

consistent levels and families"). Corporate representative Michelle Albert, HP's Rule 30(b)(6) witness, described the JA Policy as a "more standardized approach" for worker classification that allows HP to "better manage our employees and treat them on a consistent basis." Exh. 3 to Pilotin Decl. ("Albert Depo.") at 85:12–13, 86:13–14, ECF 309-3.

New employees, either direct hires or those who join HP through acquisition of a company, are "mapped" to a JA job code based on the individual manager's view of "best fit" for the employee's expected work. Albert Depo. at 97:8–98:15.

Under the JA, each job is identified by a unique code and title. The job title maps to three job characteristics: function, family, and level. See Exh. 2 to Pilotin Decl. at HP0002346; see also id. at HP0002343 ("HP uses [18] Job Functions and [more than 200] Job Families to categorize jobs based on type of work."); Albert Depo. at 97:10–14.

The functions include: Administration, Legal, Business Planning, Marketing, Corporate Administration, Public Affairs and Communications, Engineering, Quality, Engineering Services, Sales, Finance, Sales Operations, Human Resources, Services, Information Technology, Supply Chain & Operations, Learning & Development, and Technical. Exh. 1 to Pilotin Decl. at 1–2. The Job Level also takes into account whether an employee is an "Individual Contributor" or "Management." See Exh. 1 to Pilotin Decl. at 2–3. In addition, HP uses Job Levels to determine whether or not the employee is classified as exempt from overtime pay. Exh. 2 to Pilotin Decl. at HP00002339–40; see also Albert Depo. at 123:4–11.

In addition to reflecting the function, family, and level of a job, a job title is generally also accompanied by a job description. That description outlines the job's responsibilities, scope and impact, complexity, education and experience required, and knowledge and skills. Exh. 2 to Pilotin Decl. at HP0002348; see also Albert Depo. at 88:25–89:3 ("the job description [for a particular title] clearly outlines for me what [an employee with that title] is, in terms of the roles and responsibil-

ities, the knowledge, scope and impact, and so forth on."); id. at 134:4–5, 19–21 (job description is meant to describe "primary" or "key duties that you would expect a particular job to have.").

A worker's classification within the JA is meant to reflect "the content of the work . . . and the level of work that that employee is performing." Albert Depo. at 97:10–14; see also id. at 99:14 ("conceptually, the architecture was designed so that [managers] map the employees based upon the content of the work they're performing."); Exh. 2 to Pilotin Decl. at HP0002350 (JA classifications are "about the job[,] not the person"); id. at BP0002342 ("Global job levels are BP-wide designations that reflect job responsibilities and requirements."). If the content of an employee's job changes significantly, his/her manager "remap[s him/her] to reflect that change in responsibilities." Albert Depo. at 98:7–11.

At the same time, internal HP materials also describe the JA as "a 'best fit' system" because the system "includes Global Job Levels that describe a full range of job content levels and Job Families that cover a very broad range of work." Exh. 2 to Pilotin Decl. at HP0002350; see also Albert Depo. at 134:5–8 ("The job descriptions are being used by multiple organizations, multiple countries, so you want to keep it at a general level.").

## C. TSCs Within the Job Architecture

Pertinent to this case, Technical Solutions Consultant ("TSC") is a job title that falls under the "Services" Job Function and "Customer Solutions Center—Technical" Job Family. Exh. 5 to Pilotin Decl. at 1, ECF 309-5. As for Job Level, TSCs I–III are classified as "Individual Contributors" within the three lowest levels—Entry, Intermediate, and Specialty. See Exh. 6 to Pilotin Decl. at HP00008435, ECF 309-6. The JA Policy uniformly classifies TSC Is, IIs, and IIIs as exempt. Exh. 2 to Pilotin Decl. at HP00002340. TSC I, II, and III each has its own job code—00S30F, 00S30G, and 00S30H, respectively—and its own job description. Exh. 5 to Pilotin Decl. at 1–2.

According to their job descriptions, TSCs I–III are support engineers who share many responsibilities, including "successfully resolv[ing] technical issue[s]," "respond[ing] to service, product, technical, and customer-relations questions," adding the case resolution to BP's internal knowledge base systems, representing HP in customer visits and trade shows, and engaging with BP's Sales Pursuit Team. Exh. 5 to Pilotin Decl. at 1–2.

The job descriptions also reveal differences among TSC Is, IIs, and IIIs. For example, while a TSC I is responsible for "[b]egin[ing] to partner with and assist the Sales Pursuit team," a TSC II should "[d]evelop" that partnership, and a TSC III should "partner[ ] frequently with the Sales Pursuit team." Exh. 5 to Pilotin Decl. at 1–2. In addition, TSC IIs and IIIs have responsibilities TSC Is do not share, such as "[e]valuat[ing] unique or complex installations" (TSC IIs) and having the "[a]bility to act as a team or project leader" (TSC IIIs). *Id.* at 2. The knowledge and skills required of TSC IIs and IIIs similarly go beyond those for TSC Is. *Id.* at 3–4.

In addition, the evidence establishes that TSCs I, II, and III are also divided into "tiers." [2] A TSC's tier generally indicates how many engineers have attempted to address a case before it comes to that employee. In other words, a Tier 1 engineer is the first TSC to respond to a case, regardless of whether that TSC is I, II, or III, while a Tier 2 engineer generally receives a case after a Tier 1 engineer has been unable to solve it, and so on. *See, e.g.,* Exh. M to Def.'s Mot. to Seal ("Halton") ¶¶ 4–5, 330–29; Clemons ¶ 31; *see also* Exh. 8 to Pilotin Decl. ("Kumar Depo.") at 44:15–20, ECF 309–8.

### D. Internal HP Procedures and Knowledge Bases

HP also maintains "knowledge bases" or repositories of solutions that TSCs have found or developed for customer problems. These knowledge bases are meant to act as resources for other engineers. *See, e.g.,* Exh. K to Def.'s Mot. to Seal ("Grinnell")

¶ 24, ECF 330–25. HP asks TSCs to consult the knowledge bases when resolving a customer issue. *See, e.g.,* Exh. 18 to Pls.' Mot to Seal at HP00245485, ECF 305–13 (detailing process to "[s]earch the Knowledge Base for every case"); *see also* Benedict ¶¶ 10–13; Mustain ¶¶ 10–13; Vieira ¶¶ 10–13. While all TSCs are encouraged to check the knowledge base for solutions, some TSCs are also authorized to add their solutions. *See, e.g.,* Exh. P to Def.'s Mot. to Seal ("Jarosczynski") ¶ 15, Grinnell ¶ 24. Customers also have access to a selection of the knowledge base articles. *See, e.g.,* Exh. R to Def.'s Mot. to Seal ("Lewis") ¶ 13, ECF 330–39; Halton ¶ 19.

In addition to the JA and knowledge bases, HP also provides written procedures employees are expected to use in their day-to-day work, such as procedures to open a customer case and modify it in the internal systems. *See, e.g.,* Exh. 11 to Pls.' Mot to Seal, 305–6 (document detailing how to calculate and reset the Request Date and Time on a case); Exh. 13 to Pls.' Mot to Seal, ECF 305–8 (ticket correction procedure); Exh. 16 to Pls.' Mot to Seal, ECF 305–11 (how to close a case); Exh. 12 to Pls.' Mot to Seal, ECF 305–7 (step-by-step instructions on how to file a ticket with the Engineering team upon discovering a bug.). HP also has guidelines for how to deal with customers on the phone, including what to do when a customer rejects phone call monitoring, how to set a customer's hold expectations, and how to end a call. Exh. 22 to Pls.' Mot to Seal at HP00328025, ECF 305–17; *see also* Exh. 14 to Pls.' Mot to Seal, ECF 305–9 (best practices guide for engineer handling of callbacks).

### E. Realities of the Workplace

Apart from job descriptions and classifications, the actual day-to-day work of TSC I, II, and III employees is critical to the Court's determination of the issues presented. The evidence shows significant variety in salaries, education, and experience, as well as day-to-day job function.

---

**2.** Declarations and depositions also refer to "tiers" as "levels." The Court uses "tier" for clarity.

There are 404 putative class members— that is, TSCs I–III in California, Colorado, and Massachusetts. Exh. X to Def.'s Mot. to Seal ("Rowe") ¶ 3, ECF 330–51. Their annual salaries range from just under [redacted] to nearly [redacted] *Id.* ¶ 4. Their education also ranges, with some TSCs having college degrees and others having only industry certifications or associate's degrees. *See, e.g.,* Exh. B to Def.'s Mot. to Seal ("Ady") ¶ 2, ECF 330–7 (associate's degree); Exh. C to Def.'s Mot. to Seal ("Burkholder") ¶ 2, ECF 330–9 (bachelor of sciences); Exh. D to Def.'s Mot. to Seal ("Clark"), ECF 330–11 ¶ 2 (bachelor of sciences); Halton ¶ 2 (certificate of computer science from community college); Exh. V to Def.'s Mot. to Seal ("Multhauf") ¶ 2, ECF 330–47 (industry certifications). The TSCs also vary in experience. Some are relatively new to the IT field, while others have decades of experience. *See, e.g.,* Exh. O to Def.'s Mot. to Seal ("Jagannath") ¶ 2, ECF 330–33 (6 years); Multhauf ¶ 2 (9 years); Lewis ¶ 2 (32 years); Exh. T to Def.'s Mot. to Seal ("McKenna") ¶ 2, ECF 330–43 (30 years).

Notwithstanding these differences, each Named Plaintiff describes his main responsibilities while working as a TSC similarly. They recall working on "troubleshoot[ing]" or " 'break/fix' support" accomplished "according to steps and procedures that were required by HP." Benedict ¶ 9 ("My job was to try to troubleshoot the problems of HP customers ... according to steps and proce- dures that were required by HP."); Vieira ¶ 6 ("My main responsibility ... was to troubleshoot problems that HP customers experienced ... in accordance with HP's policies, procedures, and standard practices."); Mustain ¶ 9 ("My job was to try to troubleshoot the problems of HP customers ... according to steps and procedures that were required by HP.").

The evidence [3] also shows that many TSCs I–III who do support work follow a similar process: once a ticket is opened or escalated, the TSC reviews the customer's log files for information on the problem. *See, e.g.,* Clark ¶ 11; Exh. G to Def.'s Mot. to Seal ("DiPinto") ¶¶ 10–11, ECF 330–17; Exh. Y to Def.'s Mot. to Seal ("Saechao") ¶ 10, ECF 330–53. As directed by HP procedures, TSCs search for known solutions in HP's knowledge bases. The reported utility of those searches varies widely among TSCs. *See, e.g.,* Exh. I to Def.'s Mot. to Seal ("Gill") ¶ 14, ECF 330–21 (helpful in 50% of cases); Grinnell ¶ 27 (find a relevant article about 20% of the time); Halton ¶ 19 (about 5% of articles are helpful or relevant). Some TSCs report that they test possible solutions in a simulated customer environment that they create in HP's lab. *See, e.g.,* Jagannath ¶¶ 5, 8; Burkholder ¶ 15; Saechao ¶ 12.

However, the evidence before the Court also reveals significant differences in the actual day-to-day work of TSCs. For example, the "TSC" job title appears to translate into a number of "functional titles." *See, e.g.,*

---

**3.** In their Reply, Plaintiffs argue that the Court should afford the declarations provided by HP from current employees little weight. Reply at 3. Plaintiffs argue that the power differential between employee and employer necessarily makes Defendant's attempts to contact current employees coercive and the results unreliable. *See, e.g., Camp v. Alexander,* 300 F.R.D. 617, 622 (N.D.Cal. 2014) (compiling cases where "courts have ... noted the potential for coercion in situations where employers contact putative class member employees"). To show coercion in this case, Plaintiffs point to employee testimony that their managers asked them to attend an interview, that employees were told that they could either participate in the lawsuit with Plaintiffs or talk to HP's lawyer, and that employees were also not told that their rights in this lawsuit could be affected by their declarations. Reply at 3–4.

Defendant objects to the depositions Plaintiffs provide in support of their argument regarding coercion unless Defendant can introduce counter-designations for those depositions. ECF 352. The Court GRANTS Defendant's request to provide counter-designations. These include deposition testimony by declarants that participation was voluntary, *see, e.g.,* 352–2, DiPinto Depo. at 31:18–33:11, that they never spoke to their managers after agreeing to participate, *id.* at 48:14–16, and that they did not think HP would value them more for having testified, 352–3, Grinnell Depo. at 22:5–23:7. Having reviewed the evidence offered by the parties, the Court affords these depositions and declarations the weight they deserve.

In addition, Plaintiffs move to strike Defendant's Notice of Supplemental Authorities filed on February 3, 2016. ECF 367. The Court GRANTS Plaintiffs' motion to strike the unauthorized attorney argument included by Defendant in that Notice and DENIES the motion as to the supplemental authorities, *see* ECF 365.

Multhauf Decl. ¶ 3 (defining "HR job title" as TSC I and "functional title" as Software Support Engineer). Such "functional titles" include Technical Account Managers ("TAMs"), Remote Support Account Advocates ("RSAAs"), Named Account Support Engineers ("NASEs"), Technical Solution Specialists ("TSS"), Customer Advocates ("CAs"), and Duty Managers ("DMs"). Each of these functional titles appears to come with different job responsibilities and expectations. In addition, the evidence shows that TSCs I–III vary in the expertise they acquire, the customer relationships they develop, and their involvement in technical work.

Some TSC I–III roles are proactive, while others are reactive. Managers describe TAMs, for example, as employees who "have a primarily proactive role," "meet with their client regularly," "get in front of potential problems," and "are a liaison for engineers and management," *see* Exh. J to Def.'s Mot. to Seal ("Gorden") ¶ 6, ECF 330–23; *see also* Clemons ¶ 17; Exh. W to Def.'s Mot. to Seal ("Richardson") ¶ 16, ECF 330–49 (TAM is a dedicated person assigned to handful of customers and develops intense and ongoing relationship). Like TAMs, RSAAs also work in a proactive role. *Id.* ¶ 11. One manager refers to RSAAs as "trusted advisor[s]." *Id.* ¶ 11.

Employee declarations corroborate this distinction. Srilatha Gyambavantha, a TAM since 2014 and a TSC III with other roles since 2007, explains that she worked in a "reactive" role before becoming a TAM, which is "proactive." Exh. L to Def.'s Mot. to Seal ("Gyambavantha") ¶¶ 3–4, ECF 330–27. Rather than react to problems with a customer's current HP products, for example, Ms. Gyambavantha now makes recommendations for upgrades and discusses a customer's upcoming projects. *Id.* ¶ 6. Jeff Gill, also a TAM, similarly explains that, in contrast to a support engineer, he does not respond to one-off incidents and instead meets regularly with customers and advises and trains them on upgrades, new products, and features. Gill ¶¶ 5. Mr. Gill explicitly differentiates his TAM role from that of a support engineer, describing himself as "not in the role of a support engineer" but "[i]n-stead ... as a TAM." *Id.* ¶ 3. While both Ms. Gyambavantha and Mr. Gill monitor reactive support cases for their customers, they do not work on the technical support, instead intervening only to escalate issues or handle customer-relationship concerns. Gyambavantha ¶ 7; Gill ¶ 7.

TSCs also differ in the relationships they develop with customers, in terms of both depth and number. While nearly all TSC I–IIIs describe working on problems after a customer's IT department has been unable to solve it and interacting with the customer's lead IT employees, TSCs who have worked both as TAMs and in other TSC roles describe having a more intimate relationship with customers as a TAM. Jaroszynski ¶ 14 (TSC III describing her work as a part-time TAM for about a year). Like TAMs, RSAAs are also frequently dedicated to one or a handful of customers. Richardson ¶ 11; *see also* Exh. Z to Def.'s Mot. to Seal ("Stokes") ¶ 10, ECF 33055. Steven Miranda, a former RSAA, recalls acting as a liaison between his customer and the engineers, "translating" for the customer what the engineers proposed to do and providing advice to each side. Exh. U to Def.'s Mot. to Seal, ("Miranda") ¶ 6, ECF 330–45. Similarly, Peter Halton, a TSC III who is a NASE, handles a single customer in that role. Halton ¶ 7. Mr. Halton explains that "NASE customers pay a premium to have a Tier 2 engineer in their meetings and on their most critical cases." *Id.* In contrast, Mr. Richardson describes a TSS as an employee who "is not assigned to any specific customer account and supports a number of products within a certain product line." Richardson ¶ 14.

The breadth and scope of the expertise that a TSC develops in his/her time at HP also differs by his/her functional role. Jonathan Stokes, who was previously a RSAA, describes the RSAA role as being the lead technical representative to a customer and requiring a comprehensive understanding of the customer's unique environment and needs. Stokes ¶ 4. Mr. Halton describes the NASE role as similarly requiring an understanding of the customer's system and needs in order to solve problems more efficiently and for longer. *Id.* In addition, Mr.

Clemons explains that "NASEs are expected to be experts." Clemons ¶ 16.

In contrast, Mr. Stokes describes his current role as a TSS as "different," with a focus on about 20 products. Stokes ¶ 7. Mr. Richardson describes a TSS as an employee who, "unlike a TAM or a RSAA," is "a generalist." Richardson ¶ 14. Monty Burkholder, who does not provide a functional title but is a TSC III and Tier 2 response engineer, supports more than 100 products. Burkholder ¶ 4. Another employee draws the distinction for expertise not by functional title but by tier: Kathleen DiPinto, also a TSC III and Tier 2 engineer, explains that, on her team, "[a]s a [Tier] 2 engineer," she is "expected to be an expert one or two" products, while "[Tier] 1 engineers … generally are expected to know a little bit about a lot of products." DiPinto ¶ 9.

At the same time, many TSCs describe similar work: diagnosing an issue, analyzing different files, conducting research, identifying a root cause, conducting lab testing, and then developing a solution. DiPinto ¶ 8; Burkholder ¶¶ 7, 15; Grinnell ¶¶ 10, 11. But their preferred techniques and approaches also vary. Mr. Benedict describes his work as, essentially, searching for error messages in log files. Other TSCs describe such searches as largely unhelpful. *See, e.g.,* Grinnell ¶ 27 (TSC III who finds error codes about 20% of the time and otherwise must assess system behavior); Halton ¶ 15 (TSC III who uses a graphical interface tool instead of searching log lines for warnings and errors); Jagannath ¶ 5 (TSC III who notes that log files do not always contain an actual error message and instead often require analysis to find the problem's origin).

Finally, some TSCs appear to do almost entirely non-technical work. Managers describe Customer Advocates ("CAs") as employees who "manage the operations of the group" and are "non-technical employees" who "assign technical cases" and "manage escalation cases to a different engineers for customer satisfaction reasons." Gorden ¶ 7. At least one employee explains that CAs on his team are responsible for assigning cases to support engineers from the incoming queue and that CAs modify case tickets in HP's internal monitoring system. Halton ¶¶ 8, 25. Managers also describe the Duty Manager ("DM") role, which falls within the TSC umbrella, as largely customer management: A "DM's job [is] to address [a customer] dispute, calm the customer down, and figure out how to align the appropriate resource within the technical support team to the customer's need." Clemons ¶ 31.

With regard to HP's internal tracking processes, many TSCs beyond the first tier find them irrelevant to their work. *See, e.g.,* Saechao ¶ 19 (certain exhibits are used only by frontline engineers); DiPinto ¶ 21 (certain exhibits not relevant because she does not create cases). Even those that are familiar with the processes state that they do "not tell me how to do my job." Multhauf ¶ 15; *see also* Saechao ¶ 19 (Exhibit 19 relates to only 10% of work). In addition, many TSCs find HP's internal knowledge bases useless and rarely consult them. *See, e.g.,* Grinnell ¶ 27 (only find a relevant KB article about 20% of the time); Halton ¶ 19 (about 5% of KB articles are helpful or relevant); Lewis ¶ 13 (problems that could be resolved by looking at KB are usually resolved by the customer or a Tier 1 engineer).

## B. Legal Claims

Plaintiffs allege that HP misclassified purported class members as exempt from overtime; failed to pay them for hours worked in excess of forty hours per week; and failed to record, report, and/or preserve records of their hours. Plaintiffs assert that this misconduct violates the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq., see* SAC ¶¶ 67–77, ECF 258. Similarly, Mr. Vieira and Mr. Mustain, representing the purported Massachusetts and Colorado classes, respectively, assert that these actions violated Massachusetts' Wage and Hour Law, Mass. Gen. Laws Ch. 151 §§ 1A, *et seq., see* SAC ¶¶ 123–135, and Colorado's Wage Act, Colo.Rev.Stat. §§ 8–4–101, *et seq.*; Colorado Rev. Stat. § 8–6–118; and 7 Colorado Code Regs. § 1103–1. SAC ¶¶ 136–146. With respect to the purported California Class, Mr. Benedict alleges that these actions violated California Wage Order No. 4–2001 and California Labor Code §§ 510 and 1194

(misclassification and refusal to pay), SAC ¶¶ 78–83; California Labor Code §§ 201, 202, and 203 (failure to pay for all hours worked), SAC ¶¶ 84–88; and California Wage Order No. 4–2001 and California Labor Code §§ 226, 1174, and 1174.5 (failure to provide timely, accurate, and itemized wage statements). In addition, Mr. Benedict asserts that HP failed to provide meal and rest periods in violation of California Wage Order No. 4–2001 and California Labor Code §§ 218.5, 226.7, and 512, SAC ¶¶ 92–96. On the basis of these violations, Mr. Benedict also brings claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200 *et seq.*, SAC ¶¶ 97–104, and California's Private Attorneys General Act of 2004 ("PAGA"), Cal. Labor Code §§ 2698–2699.5, *see* SAC ¶¶ 105–113.

Federal, California, Colorado, and Massachusetts law all provide for exemptions from these requirements, which HP may choose to apply to qualifying classifications. Such exemptions include "administrative" and "professional" exemptions. Massachusetts and Colorado's versions of these exemptions are treated as equivalent to federal law. *See* Mass Gen. Laws ch. 151, § 1A(3); 454 Mass. Code Regs. § 27.03(3); 7 Colo.Code Regs. 1103–1:5; *Reyes v. Snowcap Creamery, Inc.,* No. 11–CV–02755, 2013 WL 4229835, at *6 (D.Colo. Aug. 14, 2013). California's administrative exemption incorporates a prior version of the federal regulations, *see* 8 Cal.Code Regs. § 11040(1)(A)(2)(f). Under the law of all three states, computer work can also be exempt. *See* 29 C.F.R. § 541.400(b)(2); Cal. Lab.Code § 515.5; *see also* 8 Cal.Code Regs. § 11040(1)(A)(3)(h)(i)–(iv).

## II. LEGAL STANDARD

■ Because a "class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," the party seeking to maintain a class action must "affirmatively demonstrate his compliance with Rule 23." *Comcast Corp. v. Behrend,* ── U.S. ──, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013) (internal citations omitted). First, the party must prove compliance with Rule 23(a). Under Rule 23(a), class certification is appropri-

ate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). In other words, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation. *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir.2012).

Second, the party "must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* Here, Plaintiffs seek to certify a damages class pursuant to Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Rule 23 outlines four pertinent factors to the Court's analysis in determining the appropriateness of a(b)(3) class: the class members' interest in individually controlling the action; the extent and nature of already-existing litigation regarding the action; the desirability (or lack thereof) of concentrating the litigation of the claims in a single forum; and manageability of the action. *See* Fed.R.Civ.P. 23(b)(3); *see also Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998).

■ "[A] court's class-certification analysis must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim ... but only to the extent[ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* ── U.S. ──, 133 S.Ct. 1184, 1195, 185 L.Ed.2d 308 (2013) (citations omitted). Within Rule 23's framework, the district court maintains broad discretion over whether to certify a class or subclass. *See, e.g., Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001).

## III. DISCUSSION

Pursuant to Federal Rule of Civil Procedure ("Rule") 23, Plaintiffs move for certification of the following classes ("State Classes"):

*California Class*: All persons employed in California as a Technical Solutions Consultant I, II, or III by BP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2009 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of California.

*Colorado Class*: All persons employed in Colorado as a Technical Solutions Consultant I, II, or III by BP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Colorado.

*Massachusetts Class*: All persons employed in Massachusetts as a Technical Solutions Consultant I, II, or III by BP's (1) Enterprise Group, Customer Solutions Center; (2) HP Software Support Delivery / IMBU Support; and/or (3) HP Software Enterprise Security Products organization at any time between January 10, 2010 and the present who was designated an "Individual Contributor" and was classified as exempt from the overtime pay requirements of Massachusetts.

Mot. at 1. The Court now considers whether Plaintiffs have met their burden with regard to Rule 23, beginning with the four requirements of Rule 23(a) and then turning to Rule 23(b)(3).

### A. Rule 23(a)

#### i. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Courts have repeatedly held that classes comprised of "more than forty" members presumptively satisfy the numerosity requirement. *See, e.g., DuFour v. Be LLC*, 291 F.R.D. 413, 417 (N.D.Cal.2013). In the context of employment litigation, courts have also certified smaller classes upon the recognition that fear of retaliation can dissuade individual employees from instituting separate law suits. *See, e.g., O'Brien v. Encotech Const. Servs., Inc.*, 203 F.R.D. 346, 351 (N.D.Ill.2001) (finding numerosity met by 30-person class seeking overtime in part because "a very important concern is the fear of retaliation for individual employees required to file individual claims"); *Horn v. Associated Wholesale Grocers, Inc.*, 555 F.2d 270, 275 (10th Cir.1977) (finding numerosity met by 41 to 46-person class alleging employment discrimination because "impracticability is dependent not on any arbitrary [numerical] limit but upon the circumstances surrounding the case").

■ Plaintiffs state that, according to BP's data, the California, Colorado, and Massachusetts classes have 213, 147, and 43 members respectively. Pilotin Decl. ¶¶ 4(a)-(c), ECF 309. Defendant does not dispute these numbers, nor does it challenge the numerosity of the California or Colorado classes.

Defendant does, however, assert that the Massachusetts class presents a numerosity problem. The only argument Defendant offers in support of this position is that "Plaintiffs have not proffered any evidence specific to Massachusetts TSCs beyond the testimony of Vieira and two others . . . who were from the same team." Opp. at 24. Defendant's argument, although identifying numerosity as a problem, appears to be geared to its challenge of commonality, particularly as Defendant does not challenge the 43 number presented by Plaintiffs. Accordingly, the Court finds that the proposed classes satisfy Rule 23(a)(1).

#### ii. Commonality

■ Rule 23(a) next demands "questions of law or fact common to the class." Fed. R. Civ. Pro. 23(a)(2). "[C]ommonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in

one stroke." *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir.2014) (citations and internal quotation marks omitted). In other words, "the key inquiry is not whether the plaintiffs have raised common questions, 'even in droves,' but rather whether class treatment will 'generate common *answers* apt to drive the resolution of the litigation.'" *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir.2013) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011)) (emphasis in original). However, not every question of law or fact must be common to the class; rather, "all that Rule 23(a)(2) requires is a single *significant* question of law or fact." *Id.* (internal citations omitted) (emphasis in original).

With regard to the class claims for overtime pay, waiting-time penalties, and inadequate wage statements, Plaintiffs proffer two legal questions and six factual questions that they contend are common to the class and capable of classwide resolution. Mot. at 15. The legal questions are: (1) whether any applicable state overtime exemption applies to TSCs, and (2) whether HP failed to maintain adequate time records for Class Members. *Id.*

Of the six factual questions, the first three apply to all three State Classes. They ask whether: (1) HP uniformly classifies TSCs as exempt from overtime pay requirements, so as to deprive them of overtime pay; (2) TSCs' duties and responsibilities involve work related to HP's management policies or HP's general business operations and (3) TSCs customarily and regularly exercise discretion and independent judgment. The other three factual questions apply only to the California class. They ask whether TSCs: (4) determine hardware, software, or system functional specifications; (5) design, develop, document, analyze, create, test, or modify computer systems or programs based on and related to user or system design specifications; and (6) document, test, create, or modify computer programs related to the design of software or hardware for computer operating systems. *Id.*

In addition, Plaintiffs proffer the following two common legal questions and two common factual questions with regard to the proposed California Class' claims for missed meal and rest breaks and unfair competition. *Id.* at 16. The legal questions are: (1) whether HP violated California's UCL by violating California's labor laws and (2) whether HP complied with California's requirement to provide meal and rest breaks. *Id.* The factual questions are: (1) whether HP lacks a policy relieving TSCs of all duties so they may take the requisite meal and rest breaks and (2) whether HP failed to pay for missed meal and rest breaks. *Id.*

Plaintiffs argue that class treatment will generate common answers to these questions because common evidence shows that TSCs have the same primary job duties and are subject to FIP's uniform JA Policy. *Id.* at 15–16. In addition, Plaintiffs contend that courts routinely find commonality in overtime misclassification cases where the plaintiff simply alleges that employees faced a common wrong by being "misclassified as exempt." *See, e.g., Greko v. Diesel U.S.A., Inc.*, 277 F.R.D. 419, 426 (N.D.Cal.2011) (finding allegation that all employees "were misclassified as exempt" sufficient for commonality threshold where defendant did not oppose); *Bowerman v. Field Asset Servs., Inc.*, No. 13–CV–00057–WHO, 2015 WL 1321883, at *14 (N.D.Cal. Mar. 24, 2015) (commonality met where the "key legal issue underlying this case is whether putative class members were misclassified under California law" and the common question is capable of a common resolution for the class).

Though Defendant's response speaks largely to the stricter common proof requirement of Rule 23(b)(3), discussed below, Defendant also contends that the record establishes substantial variation with respect to Plaintiffs' misclassification theory that all TSCs perform a "uniformly circumscribed" and "limited troubleshooting role," thereby precluding even a finding of commonality. Opp. at 19 n. 23. Defendant additionally challenges the Massachusetts Class with respect to commonality, arguing that the Massachusetts evidence is limited to testimony by three employees on one team, which cannot speak to the experience of other teams. *Id.* at 24.

■ While the Court agrees with Defendant that the evidence suggests substantial variation in the work performed among the purported class members—including details pertinent to the exemptions—the Court finds that Plaintiffs have offered sufficient common questions for which class treatment will offer common answers. Although members of the putative class have had divergent work experiences, Plaintiffs are all identically classified employees of the same company, share a set of generic job descriptions, and all raise identical legal questions. These shared legal issues, coupled with a common core of salient facts, are sufficient to establish commonality. *See Sirko v. Int'l Bus. Machines Corp.*, No. CV 13–03192 DMG SSX, 2014 WL 4452699, at *10 (C.D.Cal. Sept. 3, 2014) (finding commonality satisfied where defendant had a generic position description for purported class of tech workers but actual activities varied).

### iii. Typicality

■ Rule 23(a) next requires that the representative plaintiffs' claims be typical of those advanced by the class. Fed.R.Civ.P. 23(a)(3). Typicality is "directed to ensuring that plaintiffs are proper parties to proceed with the suit." *Ries v. Arizona Beverages USA*, 287 F.R.D. 523, 539 (N.D.Cal.2012). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir.2010) (citation and internal quotation marks omitted). The standard is permissive, *see Ries*, 287 F.R.D. at 539, and asks only whether the claims of the class representatives are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir.1998).

Plaintiffs argue that each Plaintiff was a TSC who received no overtime pay while he was employed as a TSC by HP, and that each Plaintiff's wage and hour claims—that HP required them to perform non-exempt work while classifying them as exempt—are typical of the absent class members. Mot. at 17.

Defendant does not distinguish between typicality and adequacy, but counters that the three named plaintiffs fail both requirements and that the State Classes therefore cannot be certified. Opp. at 23–25. Defendant's argument regarding Mr. Vieira focuses on typicality, while its challenges to Mr. Benedict and Mr. Mustain are more relevant to adequacy. The Court therefore addresses the challenge to Mr. Vieira below and considers the challenges to Mr. Benedict and Mr. Mustain in its adequacy discussion.

### 1. Massachusetts (Mr. Vieira)

With respect to the Massachusetts Class, Defendant contends that Mr. Vieira is subject to a unique defense, which defeats typicality. *Id.* at 23–24. Defendant argues that, prior to this lawsuit being filed, Mr. Vieira received substantial severance pay in exchange for waiving both his substantive state law claims and his ability to bring a class action. As a result, Defendant contends, Mr. Vieira's claims may be deemed released or barred from being raised as a class action, leaving the Massachusetts class without a representative. *Id.* at 24. In support of this argument, Defendant offers an unsigned waiver agreement, purportedly belonging to Mr. Vieira. *See* Exh. 27 to Horner Decl., ECF 329-27. Defendant also provides deposition testimony by Mr. Vieira that he intended to sign the waiver agreement, cannot think of a reason why he did not sign it, and received payment for signing it, but also cannot recall actually signing it. Exh. 23 to Horner Decl. ("Vieira Depo.") at 126:10–127:7–15, ECF 329–23.

Plaintiffs first argue that Defendant has failed to produce any evidence that Mr. Vieira actually entered into an agreement to waive his ability to bring a class action. *See* Reply at 13. In addition, Plaintiffs also argue that a proposed class representative's inadequacy is not a proper basis for denial of certification because the preferred course is substitution of another class member in the inadequate representative's place. *Id.*

Defendant relies on *Hanon v. Datapro-ducts Corporation* to argue that a defense peculiar to a named defendant may destroy typicality. In *Hanon*, a purported securities class action lawsuit, the Ninth Circuit found that because the named plaintiff had extensive experience in prior securities litigation, had a unique relationship with his lawyers, and engaged in uncommon stock-buying practices, it was "predictable that a major focus of the litigation will be on a defense unique to him." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir.1992). As a result, the Ninth Circuit denied his motion for class certification on typicality grounds, explaining that "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* at 508.

Defendant also offers *Cholakyan v. Mercedes–Benz, USA, LLC*, which considered the typicality of a plaintiff whose standing was in question. The court explained that "[w]hile the court has not yet resolved the question, the typicality inquiry does not demand proof that a defense will ultimately defeat the class representative's claims. Instead, it asks only whether plaintiff is likely to be preoccupied with litigating the defense to the detriment of the class as a whole." *Cholakyan v. Mercedes–Benz, USA, LLC*, 281 F.R.D. 534, 557 (C.D.Cal.2012).

In response, Plaintiffs offer two opinions from the Second and Eleventh Circuits: *Shahriar v. Smith & Wollensky Rest. Grp., Inc.* 659 F.3d 234, 253 (2d Cir.2011) and *Birmingham Steel Corp. v. Tenn. Valley Auth.*, 353 F.3d 1331 (11th Cir.2003). The Court finds neither of these opinions persuasive, as both consider the adequacy of a named plaintiff and, more importantly, conduct the inquiry after the class has already been certified.[4]

4. *Shahriar* reviewed a district court opinion that certified a class without making an express finding regarding adequacy. The Second Circuit upheld the certification, finding that "if, for some reason it is later determined by the court that the representative Plaintiffs are inadequate, the court could substitute another class plaintiff for the representative plaintiff in question." 659 F.3d at 253.

While Defendant has failed to offer Mr. Vieira's signed waiver, the Court finds the evidence sufficient to suggest that Mr. Vieira could become preoccupied with defenses unique to him, thereby derailing the claims of the class. Accordingly, the Court finds that Plaintiffs have failed to satisfy Rule 23(a)(3)'s typicality requirement for the Massachusetts Class. However, if this were the only barrier to class certification, the Court would allow Plaintiff adequate time to present a substitute class representative. The Court proceeds with the remaining analysis for the Colorado and California Classes.

### iv. Adequacy of Representation

The final requirement of Rule 23(a) is that the named Plaintiffs "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy determination requires the Court to make two determinations: (1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) whether the named plaintiffs and their counsel will "prosecute the action vigorously on behalf of the class[.]" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* (citation omitted). "Adequate representation is usually presumed in the absence of contrary evidence." *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, 249 F.R.D. 334, 349 (N.D.Cal.2008) (Armstrong, J.). The Court has an obligation to "ensure that the litigation is brought by a named Plaintiff who understands and controls the major decisions of the case." *Sanchez v. Wal–Mart Stores, Inc.*, 2009 WL 1514435, at *3 (E.D.Cal. May 28, 2009).

Similarly, *Birmingham* considered whether a district court, upon finding that the named plaintiff had become an inadequate class representative, "should have allowed a reasonable time for a class member to intervene or be substituted as the new class representative." The Eleventh Circuit held that failure to do so constituted abuse of discretion and remanded to the district court to allow another member of the class to offer itself as the representative. 353 F.3d at 1333.

Plaintiffs argue that they readily satisfy the adequacy requirement because they share the same grievances against HP as the absent Class Members and have the same interests as the absent Class Members in obtaining redress from HP. As noted above, Defendant argues that Mr. Vieira, Mr. Mustain and Mr. Benedict are not adequate representatives. Having determined that Mr. Vieira fails Rule 23(a)(3)'s typicality requirement, the Court now turns to Defendant's challenges against Mr. Benedict and Mr. Mustain's adequacy.

### 1. *California (Mr. Benedict)*

Defendant argues that Mr. Benedict is not an adequate representative for California based on unique issues going to his integrity and credibility. Opp. at 24. Specifically, Defendant argues that Mr. Benedict is insufficiently credible to represent the class because he surreptitiously imaged his work computer in the days before his resignation in obvious breach of his HP confidentiality agreement. Defendant directs the Court to Judge Koh's Order denying Mr. Benedict's motion to dismiss Defendant's breach of contract claim on the basis of similar allegations. *See* ECF 161.

Defendant relies on *Jovel v. Boiron, Inc.*, No. 11–cv–10803, 2014 WL 1027874 (C.D.Cal. Feb. 27, 2014) and *Alakozai v. Chase Inv. Servs. Corp.*, No. CV 11–09178, 2014 WL 5660697 (C.D.Cal. Oct. 6, 2014). In *Jovel*, a food labeling class action, the court considered the adequacy of a named plaintiff who first alleged that he read and relied on defendant's label in his complaint, but then testified at his deposition that he did not in fact read the label until after he purchased the product and had instead relied on a store employee's recommendation. *Id.* at *2. Following a break in the deposition, the named plaintiff "changed his story" and stated that he recalled and relied on statements on the label before purchase. *Id.* When asked about this inconsistency, the named plaintiff first denied any inconsistency and then admitted that "a conversation with his attorney during the break had refreshed his recollection about when he read the label." *Id.* at *2–3. The court concluded that the named plaintiff was inadequate because his "incon-

sistent statements were both significant and related to a material issue" and that he would therefore "reduce the likelihood of prevailing on the class claims." *Id.* at *5. In reaching this conclusion, however, the court also noted that "[i]f the credibility issues are only general in nature and do not relate directly to material issues in the lawsuit, courts will not find a lead plaintiff inadequate." *Id.* at *4.

In *Alakozai*, the court considered the adequacy of a named plaintiff who "was statutorily disqualified from securities licensing because he did not disclose that New York state revoked his insurance license for 'untrustworthy' behavior, and admitted to lying in federal court to increase his chances of recovering against a prior employer." 2014 WL 5660697 at *14. The court found that both the failure to disclose the revocation and the nature of the revocation raised concerns about the named plaintiff's adequacy, which were only furthered by the fact that his bankruptcy filings called into question his standing. *Id.* As a result, the court found that he failed to meet the adequacy requirement. *Id.*

 Plaintiffs respond that there has been no finding that Mr. Benedict acted improperly. Reply at 14. Rather, they contend, he has provided detailed sworn testimony credibly explaining his conduct and has returned all documents to HP. *Id.* Plaintiffs offer Mr. Benedict's deposition testimony, in which he explains that he regularly used his HP laptop at home, kept personal documents on the laptop, and comingled his documents with those of HP in many folders. As a result, he explained that he wanted only his personal data but copied the whole hard drive when he left because he was "running out of time collect [his] personal data." Exh. 23 to Pilotin Reply Decl. ("July 15, 2013 Benedict Depo.") 71:10–72:9, 72:20–25, 85:9–20, ECF 348–23. In addition, Plaintiffs offer caselaw to support their argument that even legitimate concerns about Mr. Benedict's actions should not automatically render him inadequate. *See In re Computer Memories Secs. Litig.*, 111 F.R.D. 675, 682 (N.D.Cal. 1986) ( "questions of personal integrity are

but one factor the Court must consider in making the adequacy determination.").

The Court agrees with Plaintiffs. Defendant has failed to show that Mr. Benedict's challenged conduct was "both significant and related to a material issue." *See Jovel*, 2014 WL 1027874 at *5. Even if Mr. Benedict did take and disclose Defendant's confidential information, as Defendant contends in its Answer, *see* ECF 100, the Court finds Defendant's allegations insufficient to challenge his adequacy as a class representative. Unlike the named representatives in *Jovel* and *Alakozai*, Mr. Benedict has not misrepresented or lied about his actions, nor does the alleged misconduct touch upon any material issue for this case. Thus, the Court finds that Plaintiffs have satisfied Rule 23(a)(4)'s adequacy requirement for the California Class.

### 2. Colorado (Mr. Mustain)

██ Defendant argues that Mr. Mustain has also injected extraneous claims into this case that would distract from any trial, and thus render him atypical or inadequate. Opp. at 25. Defendant explains that, prior to leaving HP, Mr. Mustain was promoted into a different Job Code as a Technology Consultant ("TC") III and is purporting to pursue his individual claims for time in that non-TSC position as well. *Id.* Defendants argue that Mr. Mustain's theory for these additional claims "runs counter to the premise of Plaintiffs' class theory . . . that the Job Architecture is dispositive" because he is asserting that his duties as a TSC and as a TC were the same. *Id.*

This misrepresents Mr. Mustain's position. Defendant offers Mr. Mustain's June 8, 2015 deposition testimony in support of its argument, which shows that Mr. Mustain is asserting an overtime claim for his time as a TC III because "[w]ith the added job duties of that position, my main focus was still the same as it was when I was a [TSC II]." Exh. 11 to Horner Decl. ("June 8, 2015 Mustain Depo.") at 60:12–22, ECF 329–11 (emphasis added); *see also id.* at 23:8–11 ("*Other than the interaction with the end user customer face-to-face . . . nothing had changed.*") (emphasis added). This testimony shows that Mr. Mustain does not assert that the job duties of a TSC II and TC III

are identical and therefore does not suggest that the JA misrepresents either position; instead, he asserts that, notwithstanding the differences, both jobs should have been classified as nonexempt.

Plaintiffs correctly argue that a named representative is able to represent a class while additionally bringing individual claims where there is no evidence that the individual claims will impair his ability to represent the interests of the class. *See, e.g., Satchell v. FedEx Exp.*, No. 03 Civ. 2659 SI, 2006 WL 3507913, at *1 (N.D.Cal. Dec. 5, 2006) (rejecting "defendant's contention that the Court should de-certify the class because named plaintiffs also allege non-class claims"); *Krzesniak v. Cendant Corp.*, No. C 05–05156 MEJ, 2007 WL 1795703, at *9–12 (N.D.Cal. June 20, 2007) (granting class certification where class representative also pled individual claims). Having determined that Mr. Mustain's individual overtime claims will not impede his ability to represent the Colorado Class, the Court finds that Plaintiffs have satisfied the adequacy requirement for the Colorado Class.

██ In sum, the California and Colorado Classes satisfy all of the requirements set forth in Rule 23(a). The Court therefore turns to the requirements of Rule 23(b)(3) to determine if "a class action would achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (citing the Advisory Committee Notes on Rule 23, 28 U.S.C.App. at 697).

### B. Rule 23(b)(3)

██ Rule 23(b)(3) permits a court to certify a class only when two criteria are met: (1) the questions of law or fact common to members of the class predominate over any questions affecting only individual members, *see Tyson Foods, Inc. v. Bouaphakeo*, —— U.S. ——, 136 S.Ct. 1036, 1044–46, 194 L.Ed.2d 124 (2016), and (2) that a class action is superior to other available methods for the

fair and efficient adjudication of the controversy. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.2001). The party seeking class certification bears the burden of showing that common questions of law or fact predominate. *See Zinser*, 253 F.3d at 1189. Though these criteria are interrelated, the court must address each independently. *See, e.g., Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir.1996). Defendant's argument against Rule 23(b)(3) certification focuses on predominance, and the Court begins its inquiry there.

### i. Predominance

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, —— U.S. ——, 136 S.Ct. 1036, 1045, 194 L.Ed.2d 124 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In conducting this analysis, courts must "give careful scrutiny to the relation between common and individual questions in a case." *Id.* "An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member,' while a common question is one where 'the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof.'" *Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed.2012)) (internal modifications omitted). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1778, pp. 123–124 (3d ed.2005)). In misclassification cases, Plaintiffs must "establish predominance as to the[ ] particular exemptions" at issue. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 948 (9th Cir.2011).

### 1. Sources of Common Proof

Plaintiffs argue that they have offered five sources of common evidence that would obviate the need for individualized inquiries for TSCs in the State Classes. First, Plaintiffs argue that HP's uniform classification of TSCs as exempt constitutes common proof. Defendant does not disagree that TSCs are uniformly classified as exempt, but responds that a blanket policy does not eliminate the need to make individual factual determinations as to how class members actually spent their time. Opp. at 16. In fact, Plaintiffs acknowledge that such "centralized rules" must "reflect the realities of the workplace." Mot. at 19.

Next, Plaintiffs offer the JA Policy as common evidence because, they argue, it defines who TSCs are and constrains what TSCs do. Plaintiffs contend that, under the JA Policy, HP classifies employees as TSCs "because they all do the same thing" and that a TSC's job duties are encapsulated by the JA's uniform job description for a TSC. Mot. at 20. In other words, Plaintiffs contend that the JA not only describes a TSC's job duties, but also defines and constrains them. Mot. at 20. Defendant, on the other hand, argues that the JA "only provides the kind of general, high-level job descriptions that courts have found insufficient to advance the Rule 23 inquiry." Opp. at 18.

Defendant contends that, like the uniform exemption policy, the JA Policy may be probative, but it is not dispositive because individualized inquiries would still be necessary. Opp. at 16. To support its position, Defendant relies on evidence showing the diversity of work performed by employees classified as TSCs I–III. Opp. at 18–20. For example, Defendant argues that, contrary to the limited troubleshooting role Plaintiffs describe, some TSCs (i.e., RSAAs and TAMS) engage in proactive planning and advising and serve as HP's lead technical representative to their customers. Opp. at 19. Even among TSCs who fit squarely within a troubleshooting role, Defendant argues, the work varies depending on the individual's tier and function, resulting in variations in how much judgment and discretion each employee exercises, as

well as how involved s/he is in the customer's general operations. *Id.* at 19. In addition, Defendant highlights the broad range of salaries, even among employees within one TSC level. *Id.* at 18. (citing Rowe ¶ 4). Finally, Defendant argues that the mix of work an individual TSC performs also varies, with TSCs reporting that the mixture of their duties varies by week to week. Opp. at 20 (citing McKenna ¶¶ 8, 13, 15; Gill ¶ 15; Grinnell ¶ 26; Gyambavantha ¶ 12).

To this point, the Court notes that the evidence shows a significant variation in the actual work performed by TSCs. Where Plaintiff Benedict and co-worker Ken Shropshire describe their work as "routine" and "clerical" and limited to basic help desk and troubleshooting tasks, other TSCs tell a different story. For example, Monty Burkholder describes his work as including complex performance issues, creating data collection tools, consulting on configurations and proactive improvements and performing root cause analysis. Burkholder ¶¶ 7–17, ECF 330–9. David Grinnell analyzes network failures, develops work arounds, and recommends hardware replacements. Grinnell ¶¶ 7–15, ECF 330–25. Kathleen DiPinto tests solutions in the lab and performs root cause analysis. DiPinto ¶¶ 8–16, ECF 330–17.

As their third form of common evidence, Plaintiffs focus on one small piece of the JA. In addition to the broad argument addressed above, Plaintiffs suggest that the functions of the organizations in which Class Members work constitutes common evidence. The Court interprets this as an argument that the TSCs' "Service" function precludes TSCs I–III from developing, engineering, or consulting with HP customers about HP products because that work is left to jobs under other Job Functions. Defendants respond that the division of job duties is not absolute because certain TSCs collaborate frequently with other parts of the HP organization, such as R & D and Sales. Opp. at 20. As the Court discussed above, the evidence bears out Defendant's position.

Fourth, Plaintiffs offer HP's process and technical documents as common proof of TSCs' uniform job tasks. Mot. at 21. Defendant responds that many declarants, including Plaintiffs' opt-ins, report that they either are unaware of these processes, or that the processes are not applicable to them because, for example, they are not the ones creating cases. Opp. at 22.

Plaintiffs' final source of common evidence for the State Classes is the declarations by the named Plaintiffs and 15 Class Members to corroborate that the common evidence accurately reflects their work duties. To challenge this evidence, Defendant provides declarations by 26 HP employees, including TSCs I–III and their managers. These declarations describe wide variation in the work responsibilities and experiences of TSCs I–III and state that TSCs deviate from HP's procedures. *See, e.g.,* Grinnell ¶ 16 ("Sometimes I deviate from HP's established policies and procedures, particularly for customer relations purposes"); Saechao ¶ 16 ("I have discretion to go beyond the SLA provisions to provide after hours support to customers").

Unique to the California Class, Plaintiff also offers HP's lack of a meal or rest break policy as common proof. Defendant argues that the mere absence of a written policy is insufficient as common proof and offers declaration by TSCs who state that they had no issue taking such breaks. Opp. at 25 (citing Halton ¶ 27; Gyambavantha ¶ 18; Miranda ¶ 12).

### 2. Evaluation of Evidence

Both parties rely on *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953 (9th Cir.2009) to establish the weight the Court should give to these sources of common evidence. The Court first considers the uniform exemption policy Plaintiffs offer. In *Wells Fargo,* the Ninth Circuit considered a district court's certification of a Rule 23(b)(3) class based on "substantial" reliance on the employer's internal exemption policy. *Id.* at 958. The Ninth Circuit held that "such uniform exemption policies are relevant to the Rule 23(b)(3) analysis" because "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees." *Id.* at 955, 957. At the same time, "[w]hether such a policy is in

place or not, courts must still ask where the individual employees actually spent their time" and an employer's "uniform exemption policy says little about the main concern in the predominance inquiry: the balance between individual and common issues." *Id.* at 959. As such, the Ninth Circuit held that "it is an abuse of discretion to rely on such policies to the near exclusion of other relevant factors touching on predominance." *Id.* at 955; *see also Vinole v. Countrywide Home Loans, Inc.,* 571 F.3d 935, 946 (9th Cir.2009).

Thus, the Court finds that the uniform exemption policy offers probative, but not dispositive, common evidence. It suggests that HP considered the employees to be similar at least to some degree, but does not obviate the need for individual inquiries into whether or not FIP's classification was correct.

*Wells Fargo* also offers guidance with regard to the value of the JA Policy, the TSCs' job function, and FIP's internal process documents as sources of common evidence. "[C]ourts have long found that comprehensive uniform policies detailing the job duties and responsibilities of employees carry great weight for certification purposes." *Wells Fargo,* 571 F.3d at 958. They "often bear heavily on questions of predominance and superiority" because "[s]uch centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof." *Id.* at 958–59 (emphasis added); *see also Vinole,* 571 F.3d at 947 (discussing the importance of "companywide policies governing how employees spend their time").

Therefore, the key question is the extent to which these centralized policies "reflect the realities of the workplace." *Wells Fargo,* 571 F.3d at 958–59. *See also Sirko v. Int'l Bus. Machines Corp.,* No. CV 13–03192 DMG SSX, 2014 WL 4452699, at *11 (C.D.Cal. Sept. 3, 2014) ("No less important is evidence bearing directly on the Court's 'need to make a factual determination as to whether class members are actually performing similar duties.' ") (quoting *Wells Fargo,* 571 F.3d at 959). Such evidence includes "uniformity in work duties and experiences that diminish

the need for individualized inquiry." *Id.* (quoting *Vinole,* 571 F.3d at 947.)

As noted above, the uniformity in work duties—or lack thereof—must be relevant to the particular exemptions at issue. *See Marlo,* 639 F.3d at 948. *See also Perez v. Allstate Ins. Co.,* No. 11–1812, 2014 WL 4635745 (E.D.N.Y. Sept. 16, 2014), 2014 WL 4635745, at *20 (predominance is "met where the primary job duties of [class members] are largely similar for purposes of the . . . exemption determination"). Here, Defendant relies on the administrative and professional/ computer exemptions of each state. Thus, the Court next considers whether the applicability of these exemptions to the putative State Classes is predominantly subject to common proof.

### 3. Exemptions

Common to each administrative exemption is the requirement that the employee perform "work directly related to management policies or general business operation of his/ her employer or his employer's customers." *See, e.g.,* 8 Cal.Code Regs. § 11040(2)(a)(i), 29 C.F.R. § 541.200(a). This includes "computer network, internet and database administration," among other functions. *See* 29 C.F.R. § 541.201(b). In addition, employees "acting as advisers or consultants to their employer's clients or customers (as tax experts or financial consultants, for example) may be exempt." 29 C.F.R. § 541.201(c).

The administrative exemptions also require that the "employee's primary duty . . . include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a); *see also* 8 Cal.Code Regs. § 11040(2)(b). "[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). Work must relate to "matters of significance," in contrast to being "clerical" or "routine," or simply involving following well-established procedures found in manuals or similar sources. 29 C.F.R. § 541.202(b), (e).

Insofar as Massachusetts and Colorado follow federal law, the "primary duty" test takes into account, among other things, the "relative importance of the exempt duties as compared with other types of duties," as well as "the amount of time spent performing exempt work." 29 C.F.R. § 541.700(a). Under California law, the "primary duty" test turns principally on the amount of time the employee spends on exempt versus non-exempt work, and this inquiry must be made on a workweek-by-workweek basis. 8 Cal.Code Reg. § 11040(1)(A)(2)(f); *see also Marlo,* 639 F.3d at 948. An employee whose primary duty is a combination of exempt duties is also exempt. *See* 29 C.F.R. § 541.708; *Hill v. R + L Carriers, Inc.,* 690 F.Supp.2d 1001, 1008 (N.D.Cal.2010) (considering California law).

In addition, under the law of all three states, computer work can be exempt when it involves, among other things, "the design, development, documentation, analysis, creation, testing or modification of computer systems or programs ... based on and related to user or system design specifications." 29 C.F.R. § 541.400(b)(2). For Massachusetts and Colorado, this work would fall under the professional exemption. *See* 29 C.F.R. § 541.400(a). California's freestanding computer exemption also focuses on these duties. Cal. Lab.Code § 515.5; *see also* 8 Cal.Code Regs. § 11040(1)(A)(3)(h)(i)–(iv).

#### 4. *Sufficiency of Common Evidence*

Pursuant to these regulations, "technical support" work may or may not qualify as exempt, depending on the employee's specific duties. The question before the Court now is not whether the work of the TSCs I–III qualifies as exempt or non-exempt, but rather whether that question can be answered with the common evidence provided by Plaintiffs. The Court concludes that it cannot. Defendants are correct that individual inquiries would be necessary to determine what constitutes each TSC's primary duty because the evidence shows that TSCs have work experiences that differ in ways that go to the heart of the elements of the exemptions.

The Court finds a comparison of the descriptions provided by TSCs instructive. Take two TSC IIIs for example: Mr. Gill and Mr. Shropshire. Mr. Gill is a TAM with nearly 30 years of experience in the tech industry who earns more than [redacted] per year in base salary. He describes doing work that "typically would be handled by consultants out of HP Software's Professional Services organization." Gill ¶ 6. Specifically, he is responsible for "customizing the new product to meet the customer's specific needs, integrating it into the customer's unique environment, creating a long-term action plan that includes directing the work of the customer's technical staff and other personnel in implementing the upgrade, training the customer on the new product, and conducting capacity planning and planning the data migration in connection with this project." *Id.* In contrast, Mr. Shropshire, formerly a former TSC III and II testified that he did not make decisions about how to solve problems, never determined the exact nature of a problem without referring to the troubleshooting procedure, relied on Tier 3 engineers for solutions and acted as a conduit who made no determinations about what to pass on to the customer. Exh. 10 to Horner Decl. ("Shropshire Depo.") at 112:15–17, 155:12–15, 158:8–159:3, 165:1–2, ECF 329–10.

This contrast illustrates the deficiency of each of Plaintiffs' offered common sources of evidence and the necessity of individualized inquiries to determine whether or not a TSC qualifies for an exemption. With regard to the deficiencies of the common proof, this testimony shows that neither the JA nor a TSC's function within the HP organization is determinative of his tasks. This is evidenced not only by the differences in Mr. Gill's and Mr. Shropshire's descriptions, but also in Mr. Gill's explanation that he is doing work normally assigned to a different HP organization. With regard to the necessity of individualized inquiries, these two employees show the broad range of tasks performed by TSC I, II, and IIIs, from consultants who exercise independent judgment (e.g., Mr. Gill), to others whose performance is limited to rote work without any exercise of judgment (e.g., Mr. Shropshire).

And these differences are not unique to Mr. Gill and Mr. Shropshire. Like Mr. Gill, numerous other TSCs I–III describe

work that does not match the help desk, troubleshooting description offered by Plaintiffs—such as writing code, advising clients, training other engineers, and exercising significant judgment. *See, e.g.*, Gyambavantha ¶ 6 (lead weekly calls with customers to discuss upgrades and future projects); Jagannath ¶ 10 (train other engineers); McKenna ¶ 7 (almost equal time working on customer issues and mentoring or training less experienced engineers; also manage one-off projects). On the other hand, like Mr. Shropshire, other TSCs I–III recall doing routine work that requires minimal judgment and discretion. *See, e.g.*, Exh. 5 to Horner Decl. ("Benedict Depo.") at 264:10–15, ECF 329-5 ("I hit find. I look for an error message. If I find an error message, then I paste it into a search engine and see if there's a set of steps to follow from the error message"); Exh. 7 to Pilotin Reply Decl. ("Lewis Depo.") at 48:14–25, ECF 348-7 ("We have a set of scripts that are available for our product").

Also like Mr. Gill, a number of TSCs deviate from the policies and procedures that Plaintiffs offer as a source of common proof. *See, e.g.*, Grinnell ¶ 16; Saechao ¶ 16.

Defendants also correctly point out that, even for the TSCs whose work appears similar but includes both exempt and non-exempt work, the proportion of each varies such that an individualized inquiry would be necessary to determine each employee's primary duty. *See, e.g.*, Exh. N to Def.'s Mot. to Seal, Inghram ¶ 8, ECF 330-31 (20% of cases are routine and can be resolved off top of head); Jagganath ¶¶ 5, 7 (90% of cases as Level 3 require investigation and analysis; less than 20% of Level 2 cases were straightforward); Grinnell ¶ 9 (95% of cases are not routine); Halton ¶ 17 (routine about 1% of time). *See also* Gill ¶ 15 (50% proactive work).

In sum, to determine whether or not the TSCs qualify for one of the asserted exemptions, the Court would have to be able to determine from Plaintiffs' common proof that each employee either does or does not do "work directly related to management policies or general business operation of his/her employer or his employer's customers," does or does not exercise "discretion and independent judgment with respect to matters of significance" as their "primary duty," and does or does not "design, development, documentation, analysis, creation, testing or modification of computer systems or programs," among other things. The common evidence Plaintiffs have offered does not suffice to make these determinations. Accordingly, the Court finds that common questions do not predominate. Plaintiffs have failed to carry their burden of demonstrating predominance.

#### ii. Superiority

 "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually, a class action is not 'superior.'" *Zinser*, 253 F.3d at 1192. As discussed above, the determination of whether or not a TSC I–III is exempt would require individual inquiries, Plaintiffs have also failed to carry their burden under the superiority prong of Rule 23(b)(3).

Accordingly, Plaintiffs' Motion for Class Certification is DENIED.